BELCHER-STINE LUMBER CO. *v.* BURNS.

1. ATTACHMENT—SALE BY SHERIFF—SALES—CONTRACT TERMINATING SELLER'S LIEN.

  Trover lies for the conversion of lumber owned by the plaintiffs, seized in attachment against third parties, and sold by the sheriff without awaiting the levy of execution, the lumber having been transferred to plaintiffs by the purchasers who bought it subject to the terms of a contract which provided for a lien until notes of the purchasers were given; the evidence showing the execution of the stipulated notes.

2. SAME—AFFIDAVIT—PARTIES.

  An affidavit in attachment which describes the defendants named as a copartnership, when, in fact, one of them is not a member of the firm, is not so defective as to deprive the court of jurisdiction. MOORE, J., dissenting.

Error to Wayne; Brooke, J. Submitted October 22, 1909. (Docket No. 174.) Decided December 31, 1909.

Trover by the Belcher-Stine Lumber Company against James D. Burns, sheriff of Wayne county. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*Harry M. Lau* (*George M. Sayles,* of counsel), for appellant.

*Bowen, Douglas, Whiting & Eaman* (*Herbert V. Barbour,* of counsel), for appellee.

OSTRANDER, J. I do not think the record supports the conclusion that the attachment proceeding was void in the sense that it was a nullity, that the court had no jurisdiction, and that a judgment rendered therein would upon its face have been without force or effect.

The record discloses that the lumber which the defendant, as sheriff, took into his possession in executing the

writ of attachment was sold by the sheriff at the instance of the plaintiffs in attachment, and the money turned over to said plaintiffs. It seems to me, therefore, that the question presented is this: Did the sheriff sell lumber which belonged to the plaintiffs? If not, he is not liable for its conversion. The plaintiffs in attachment had no contract with the plaintiff in this suit. Their contract was with the copartnership. That contract provided that the title to the lumber should pass to said copartners—

"As soon as the same is cut and piled in said millyard, subject only to lien of said first party for the purchase price of said lumber."

The record discloses that, as between the said copartnership and the plaintiff herein, it (the plaintiff) assumed the contracts of the copartnership, but without acquainting the owners of the lumber with the fact that a corporation had been formed. If the plaintiff owned the lumber in question, it is because title to it passed to it upon its delivery on board cars after it had paid for the same according to the terms of the contract. The contract provides:

"Terms of payment to be four months' note to be given upon rendering invoice for each 500 M. feet of lumber sawed."

It seems to be established, although the record is not very clear upon the subject, that notes of the plaintiff had been given for the particular lumber. I conclude, therefore, that the title to the lumber passed when the same was delivered on board cars and by the terms of the contract itself no lien remained with the former owners of the lumber. The lumber which the sheriff seized was the lumber of the plaintiff, and it had the right to maintain this action. I therefore concur in affirming the judgment of the court below.

GRANT, MONTGOMERY, and McALVAY, JJ., concurred with OSTRANDER, J.

Moore, J. (*concurring*).   From a judgment obtained in favor of the plaintiff the case is brought here by writ of error.

In June, 1905, a written contract was entered into between the Lewis Cornwell estate for the sale of lumber to Belcher-Stine Lumber Company, a partnership.   The sale included all of the hemlock lumber cut at the mill of the Lewis Cornwell estate at Wolverine, Mich., during the season of 1905.   The provisions of the contract important in this controversy read as follows:

"Terms of payment to be four months' note to be given upon rendering invoice for each 500 M. feet of lumber sawed.   The invoice for the first one million feet, already sawed, to be rendered immediately and four months' note to be given for the same.   All lumber to be measured by said first party when the same is placed upon cars, and invoice rendered therefor to second party.   Said second party shall move said lumber promptly, as fast as the same is in shipping condition; sixty days from date of sawing being understood to be the length of time required for drying.   The title to said lumber to pass to the party of the second part, as soon as the same is cut and piled in said millyard, subject only to lien of said first party for the purchase price of said lumber.   Lumber is to be kept insured by party of the first part."

What occurred later is stated by the learned trial judge as follows:

"Under this contract the lumber was shipped to Belcher-Stine Lumber Company, a copartnership, and notes given, signed by Belcher-Stine Lumber Company by George B. Stine, until January, 1906, after which date notes given in payment were signed, 'The Belcher-Stine Lumber Co., by George B. Stine, Vice President,' or by 'F. S. Belcher, President.'   The change in the signature of the notes given was due to the fact that a corporation had been formed, except that the notes called 'The Belcher-Stine Lumber Co.,' which corporation took over all the contracts of the Belcher-Stine Lumber Company, a copartnership. No notice was given to the Cornwell estate that a corporation had been formed, except that the notes were signed by the president or vice president when they had previ-

ously been signed only by George B. Stine, and some of the letter paper used showed very plainly that a corporation had been formed, although after the formation of the corporation some letter heads of the old partnership were used. Lumber was shipped to the corporation for several months and the corporation notes accepted and paid. Finally, certain notes were allowed to go to protest, and on receipt of this notice the Cornwell estate immediately started an attachment suit in Detroit against the Belcher-Stine Lumber Company, a copartnership, and seized the two car loads of lumber in dispute in this case. The affidavit for the attachment described the copartnership as composed of Fred S. Belcher, George W. Belcher, and George B. Stine. Now, there was no such partnership in existence at this time, and no such person as George Belcher in existence. The Cornwell estate accounts for this mistake in the affidavit by showing that they made inquiries in Toledo, and were told that the partnership was composed of the men mentioned in the affidavit. The lumber seized belonged to the Belcher-Stine Lumber Company, an Ohio corporation, and was not the property of the partnership described in the affidavit for the attachment. After this lumber was seized a demand was made upon the sheriff who had taken a bond from the Cornwells, and the demand was refused. The suit (an action in trover) was then started to recover the value of the lumber from the sheriff. The lumber was appraised and sold for $344.32."

It is insisted on the part of the appellee that the attachment proceeding was void because of the defect in the affidavit. On the part of the appellant it is said that the defense, if any, growing out of this defect, was personal to the partnership and cannot inure to the benefit of the plaintiff in this suit. Section 10556, 3 Comp. Laws, provides what must be stated in the affidavit to entitle one to a writ of attachment. In *Estlow* v. *Hanna*, 75 Mich. 219 (42 N. W. 812), the court says:

"The affidavit is necessary to confer jurisdiction. * * * The remedy itself is a harsh and extraordinary one, proper when it comes within the plain provisions of the statute, but the statute should not be extended by construction "

There was no personal service and no general appear-

ance of the defendant in the attachment case. In *Nugent* v. *Nugent*, 70 Mich. 52 (37 N. W. 706), it was held that, in an attachment proceeding against a nonresident defendant who does not appear, the proceeding may be attacked collaterally; citing *Granger* v. *Judge of Superior Court of Detroit*, 44 Mich. 384 (6 N. W. 848); *King* v. *Harrington*, 14 Mich. 532; *Millar* v. *Babcock*, 29 Mich. 526.

It is contended that, conceding the attachment proceedings are defective, plaintiff in the attachment case still had a lien against the property by reason of the contract which could be asserted. The trial judge was of the opinion that the lien was lost by the shipment of the lumber to the vendee. We need not decide whether this is correct, because the defendant in this case was doing what he did, not in an effort to enforce a lien, but as an officer proceeding by virtue of a writ of attachment. The record shows the property was appraised and sold by the defendant. It does not show that he sold the property by virtue of an order of the court.

In *Trowbridge* v. *Bullard*, 81 Mich. 451 (45 N. W. 1012), it was said:

"The office of the writ of attachment is to hold the property until the coming of an execution to enforce a judgment against the property of the debtor, so that the debtor may not put his property beyond the reach of such creditor when he shall obtain judgment. * * * The writ of attachment confers no right to sell the property except in special cases, when ordered by the court."

In *Terry* v. *Metevier*, 104 Mich. 50 (62 N. W. 164), which was an action of trover against a sheriff for the conversion of property which he had seized under a writ of attachment and sold without judicial sanction, the court says:

"It was the duty of the officer to hold the property until the coming of an execution to enforce the judgment in the case. He had no right to sell and dispose of the property without an order of the court, and that could be ob-

tained only upon a special showing of necessity. Here he sold a portion of the property, and permitted the remainder to be removed beyond the jurisdiction of the court. This amounts to a conversion of the property.

The court in the above case quotes approvingly from *McGough* v. *Wellington,* 6 Allen (Mass.), 505, as follows:

"An officer who has a precept which authorizes him to take property may take it under and by virtue of his precept; or he may take it wrongfully to convert it to his own use. If, at the trial, he justifies under his precept, and has conducted himself strictly according to its requirements, he is protected, because he is then entitled to the conclusive presumption that he acted under his lawful authority. But if, before the trial, he has exceeded his lawful authority, the law presumes that the original taking was not for the purpose of serving his precept, but as a trespasser. The facts which occur after the suit is commenced do not constitute a cause of action, but are merely evidence from which arises the absolute presumption that his first taking was a trespass. The character of his original act is shown by his subsequent conduct. It is in the nature of an admission that he did not act under his precept, and such an admission is as effectual in proof if made at one time as at another. The cause of action is the original unlawful taking. That the original taking was unlawful is shown by his subsequent conduct."

Judgment is affirmed.